## CONTINENTAL SUPPLY CO. v. MARSHALL et al.

Civil Action No. 1127.

District Court, W. D. Oklahoma.
Nov. 10, 1943.

718

Edward W. Spiers and V. J. Bodovitz, both of Oklahoma City, for defendant Marshall.

Mark Goode and John Goode, both of Shawnee, Okl., for defendant Federal Nat. Bank of Shawnee, Okl.

VAUGHT, District Judge.

The plaintiff sues to recover a money judgment against the defendants and to foreclose a mortgage given by the defendant H. G. Marshall to secure the payment of a note for $47,137.31, plus interest, costs and attorney fees, as provided for in the note. The facts, as disclosed by the evidence, are as follows:

A suit was pending in the United States District Court for the Western District of Oklahoma, being Cause Number 924–Civil, in which the plaintiff in this cause was the plaintiff and the defendant H. G. Marshall and others were defendants. A compromise was effected in that litigation, in which the amount due from the defendant Marshall was determined between the parties, which formed the basis of the indebtedness in the case at bar. The cause then pending was dismissed.

The said H. G. Marshall, on the 11th day of March, 1942, entered into a written agreement with The Continental Supply Company, the plaintiff (hereinafter referred to as Continental), in which it was agreed that Cause Number 924–Civil, supra, should be dismissed without prejudice and that Continental would release certain securities that it held against Marshall and others; that Marshall was to execute to Continental, his note dated January 2, 1942, for $47,137.31, due April 2, 1943, with interest at six per cent. per annum from the date of the note. That to secure the payment of the note, Marshall was to execute a form of real estate mortgage covering certain interests in the 7/8ths working interest which he owned in certain oil and gas leases on real estate in Pottawatomie County, Oklahoma, specifically described in the agreement, known as the Pecore, Whitehead and Pensoneau leases. The agreement provided that the Pensoneau and Whitehead leases were subject to prior mortgages in favor of The Federal National Bank of Shawnee (hereinafter referred to as the Bank), in the aggregate face amount of $40,000, together with other indebtedness due and payable, and Marshall represented the entire indebtedness due on those mortgages would not exceed $35,000,

D. I. Johnston and Roy C. Lytle (of firm, Keaton, Wells & Johnston), both of Oklahoma City, Okl., for plaintiff.

including interest. The contract provided that the gross receipts from the properties, less the actual operating expenses on the Whitehead and Pecore leases, should be paid to the Bank until its lien was discharged, together with other provisions for the operation cost of the Pensoneau lease. Marshall agreed that he would not borrow from the Bank any additional funds to be secured by the mortgages then held by it, and that he would procure a statement from the Bank by letter stating the exact amount due the Bank with interest calculated to March 1, 1942. Marshall also agreed that he would procure a letter from the Bank agreeing that it would not lend him any additional sums to be secured by the mortgages then held by it covering the said interests in the leases. This latter provision was subsequently stricken from the agreement by mutual consent. The agreement further provides that Marshall contemplated selling certain interests in the Pensoneau lease, and that in the event of such sale, Continental would release the same from its mortgage upon the payment of the purchase price to the Bank, as was more fully set out in the instrument.

Following this agreement, Marshall executed the note sued upon in the case at bar, dating the note January 2, 1942. He also executed the mortgage provided for in the agreement on March 26, 1942. The note and mortgage were duly delivered to Continental on March 26, 1942. A letter had been prepared on March 4, 1942, and delivered to Marshall, to procure the signature of the Bank agreeing not to lend any additional money to him on the security held by the parties. The completed letter was not procured by Marshall from the Bank and, as above stated, that portion of the agreement was later stricken. On April 1, 1942, D. I. Johnston, one of the attorneys for Continental, had a telephone conversation with Mr. Buck, president of the Bank, with reference to the letter of March 4, 1942, given to Marshall, who was to present it to the Bank, in which the Bank was to agree not to lend Marshall any additional money on the securities held by it. Mr. Buck, in that conversation, stated that a Mr. Dellinger, a representative of Continental, had just had three telephone conversations with him of about twenty minutes each in regard to the matter, just prior to the conversation being had with Johnston. Mr. Buck said he had not handled the matter, but was opposed to giving such a letter, and that so far as he knew such a letter had not been presented to the Bank for its consideration. The result of that conversation was that Mr. Johnston was to mail a copy of the letter to the Bank for its consideration. A letter was mailed to the Bank the same day, enclosing a copy of the letter of March 4, 1942, which contained the information that a mortgage on the property was being given to Continental, and the evidence discloses that the note and mortgage had been executed by Marshall to Continental on the date of the telephone conversations with Mr. Buck, by Mr. Dellinger and Mr. Johnston. On April 7, 1942, a letter was written and mailed to the Bank by the attorneys for Continental, in which the Bank was informed that the agreement and mortgage had been executed by Marshall. The letter contained the following paragraph:

"Although you have refused to execute a letter agreeing that you would not lend him additional sums to be secured by the mortgages that are prior to those of Continental Supply Company, we would appreciate it very much if you would inform us the present balance due the Bank by Mr. Marshall either on his direct obligations or by virtue of endorsements of other persons' or companies' notes. In this connection, you are informed that Mr. Marshall has in his contract with Continental Supply Company, agreed that he would not borrow any additional funds from you which would have the effect of increasing the indebtedness which might be secured by your mortgage. If the agreement which he has signed and tendered to Continental Supply Company is accepted, Continental Supply Company would obviously be required to contest the priority of any additional funds which you might advance Mr. Marshall."

On April 9, 1942, the Bank acknowledged the receipt of the letter of April 7, supra, and contained the following:

"If Mr. Marshall has given you a second mortgage on the properties and you demand that we do not make any further loans against our mortgage, of course we will have to abide by your demands in this matter, however, I think it will work a hardship on Mr. Marshall as at times he needs payrolls and other things and it would practically shut off his credit here.

"I would not feel at liberty to give you the amount Mr. Marshall owes us without his consent."

On April 16, 1942, the Bank wrote Continental as follows: "With further reference to your letter of some days ago concerning the above named, we have today obtained permission from Mr. Marshall and are pleased to give you the amount of his indebtedness both by endorsement and otherwise which was at the close of business March 15, 1942—$25,075.86 secured by a mortgage on the Pensoneau and Whitehead leases."

The mortgage executed by Marshall to Continental, on March 26, 1942, was mutually altered and re-executed on April 14, 1942, by substituting the last page thereof, the only material changes being the insertion of the following paragraph:

"This mortgage is executed pursuant to one of the provisions of an agreement entered into between the parties hereto, which agreement is dated March 11, 1942 and is incorporated herein by reference."

And in the last paragraph thereof there was inserted: " * * * and if first party shall comply with all of the terms and provisions of said agreement of March 11, 1942, referred to above, * * * or if the first party shall breach any of the terms or conditions contained in said agreement of March 11, 1942, * * *."

These changes merely accelerated the collection clause of the mortgage, but did not fundamentally affect the relation between Continental and the Bank. The mortgage was duly recorded as a real estate mortgage on April 18, 1942, in Pottawatomie County, Oklahoma, in book 119 at page 428.

Subsequent to March 15, 1942, the Bank advanced to Marshall various sums of money. The plaintiff contends that all such sums of money so advanced, and particularly subsequent to April 1, 1942, are inferior to the claims of Continental. The plaintiff bases this contention upon the notice it alleges the Bank had, of the terms of the contract and mortgage executed by Marshall.

Each of the mortgages held by the Bank contained the following clause: "Now therefore, in order to secure the above indebtedness as evidenced by said notes, and all extensions, renewals, substitutions and changes in form thereof, together with all interest, charges and fees thereon, and as well also to secure the payment of all other indebtedness, obligations and liabilities of the mortgagor to the mortgagee, now existing or hereafter arising, wheresoever and howsoever acquired by the mortgagee, whether in the usual course of business dealings or otherwise, (provided the total amount of all existing and future indebtedness not herein specifically described shall not exceed the sum of Twenty Thousand Dollars ($20,000.00) ), and as well also to secure any other sums and amounts for which the mortgagee shall or may become liable to pay for the protection of this security, and to secure as well any indebtedness which the mortgagee may become obligated to pay on behalf of the mortgagor, whether by agreement or by operation of law, * *."

This contention of the plaintiff raises a number of questions.

First. What was the character of the mortgage held by the plaintiff, and where should it properly be recorded? The Bank contends that it is a chattel mortgage and should be filed as such to give statutory notice, and cites the following statute as governing the entire situation, 46 Okl.St. Ann. § 75: "Any Chattel mortgage may secure future advances to be made by the mortgagee or assignee, at this [sic] or its option for any purpose, but not to exceed in the aggregate an amount stated in said mortgage; and all advances so made shall be secured by such mortgage equally, to the same extent and with the same priority, as the amount originally advanced on the security of such mortgage and such advances may be made and repaid and again made and the amount so stated shall be considered only as the total amount of such advances as may be outstanding at one time."

From this the Bank argues:

1. A second mortgage and notice thereof could not affect the rights of the Bank or the lien of its mortgage, and

2. The Bank's mortgage is prior, notice is immaterial, and the amount owed is likewise immaterial, if the total at any time did not exceed the limit fixed by statute.

The great weight of authority seems to be contrary to these views, as will be hereinafter pointed out. Notice is the controlling feature in this controversy. The mortgages of both parties are what are known as chattels real. Their place of recording is governed by 46 Okl.St.Ann. §

1, as follows: "Every instrument purporting to be an absolute or qualified conveyance of real estate or any interest therein, but intended to be defeasible or as security for the payment of money, shall be deemed a mortgage and must be recorded and foreclosed as such."

It will be observed that the parties, both Continental and the Bank, filed their mortgages as real estate mortgages, and properly so. The Bank also filed its mortgages as chattel mortgages. The effect of recording them as such, as to notice, is governed by 46 Okl.St.Ann. § 7, as follows: "The record of a mortgage duly made, operates as notice to all subsequent purchasers and incumbrancers." The recording and filing statutes are intended to give constructive notice. If one has actual notice, whether he also has constructive notice, is not material.

Second. Did the Bank have actual or constructive notice of the plaintiff's mortgage, and when did it receive such notice?

Quoting from Title 25, Okl.St.Ann.:

Section 11. "Actual notice consists in express information of a fact."

Section 12. "Constructive notice is notice imputed by the law to a person not having actual notice."

Section 13. "Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, and who omits to make such inquiry with reasonable diligence, is deemed to have constructive notice of the fact itself."

Counsel for the Bank argue that the filing of the plaintiff's mortgage as a real estate mortgage and the failure of the plaintiff to file its mortgage as a chattel mortgage do not, and did not avail as notice, under section 14, Title 25, Okl.St. Ann., which section reads: "A notice which is false when given is not valid by the subsequent happening of the event."

This contention is untenable and without merit. The evidence discloses that the Bank had both actual and constructive notice of the terms of the plaintiff's mortgage.

The subject of notice is thoroughly discussed in Morgan v. Stanton Auto Co. et al., 142 Okl. 116, 285 P. 962, 963, wherein the court quoted with approval the opinion in the early case of Strahorn-Hut-ton-Evans Commission Co. v. Florer & Bannerman, 7 Okl. 499, 54 P. 710, as follows:

" 'It is a well-settled principle of law that notice is the equivalent of knowledge, and may be divided into two classes, constructive and actual. Constructive notice is that imparted by the record, and is a matter of statute. Actual notice exists when knowledge is actually brought home to the party to be affected thereby. It also includes implied notice, which is notice to the authorized agent of the party sought to be bound by the notice. The filing of a chattel mortgage for record, and the recording thereof, are but constructive notice of its existence; and, if the party had notice of its existence otherwise than by its record, the full purpose of the recording act is attained. * * *

" 'As between the mortgagor and mortgagee the mortgage is valid, although not recorded; and we do not think that one who takes a subsequent mortgage upon property which he knows is embraced within the prior unrecorded mortgage of another can be permitted to assail such prior mortgage because of the mere failure to record it. * * *

" ' "The mere fact, therefore, that respondent's mortgage was not verified or recorded will not render it invalid as to appellant unless he purchased the property for value, and in good faith; and no one can become a purchaser or an incumbrancer of property in good faith if he have notice of a pre-existing mortgage, although such mortgage may not be recorded or verified in accordance with the statute." ' "

In view of the foregoing statutes and authorities, it is evident that the plaintiff had both actual and constructive notice of the mortgages held by the Bank, which notice carried with it all the provisions of those mortgages at the time the plaintiff entered into the contract and took the mortgage from Marshall on March 26, 1942. On April 1, 1942, the Bank had notice of the agreement with, and the mortgage executed by, Marshall to the plaintiff, which carried with it notice of everything that would be developed by proper inquiry.

Third. What is the law regarding the situation as to whether the plaintiff is entitled to priority on its lien over the Bank on its liens for money advanced to Marshall to be secured by its mortgages after notice of April 1, 1942?

■ Counsel have cited no Oklahoma authorities, and the court has found none bearing upon this question. Reference, therefore, must be made to other jurisdictions. The great weight of authority holds that an advance made pursuant to a mortgage to secure future advances, which the mortgagee was not obligated to make, and which he was not entitled to make except upon the request or approval of the mortgagor, is subordinate and inferior in lien to an intervening encumbrance between the giving of the mortgage and the making of the advance, if the advance was made with actual knowledge of the intervening encumbrance.

A case in point from the state of Washington is Elmendorf-Anthony Co. v. Dunn et al., 10 Wash.2d 29, 116 P.2d 253, 254, 138 A.L.R. 558. Here was a construction loan, given to complete a building. The mortgage provided that in the event the building should not be completed according to plans and specifications submitted, et cetera, the mortgagee might take possession and complete the building, and provided further: " * * * and monies expended by the mortgagee in connection with such completion of construction shall be added to the principal amount of said note and secured by these presents, and together shall be payable by the mortgagor on demand, with interest at the rate set forth in said note." The building was not completed by the mortgagor and was abandoned. The mortgagee entered the premises and completed the same at an expenditure of $408.50. After the first mortgage was given, the owner of the property gave a second mortgage to a lumber company for $989.51 on the same property. The holder of the first mortgage had actual notice of the second mortgage. The court held, quoting from the headnote: "Optional advances, made by mortgagee to mortgagor under real estate mortgage with actual knowledge of intervening incumbrance on mortgaged property, are made subject to such incumbrance."

In the annotations following the report of this case in 138 A.L.R., supra, are numerous authorities covering many states. Among the citations is Schmidt v. Hedden, N.J.Ch., 38 A. 843, 845, where the court said: "I find no cases which justify me in holding that, so far as the form of the notice is concerned, any information beyond that of the existence of the subsequent incumbrance is required in order to constitute the actual notice which will charge the prior mortgage with the legal effect of making future advances with this knowledge."

In Davis et al. v. Carlisle, 8 Cir., 142 F. 106, 108, the court had before it a similar case in principle, and held:

"When, under a mortgage providing for future advances, but leaving it optional with the mortgagee whether he shall make them, they are made after he has been advised that a subsequent mortgage has been given upon the property, his lien for such advances will be postponed to that of the junior incumbrance." Citing cases.

"If the mortgage of Carlisle was, as to the subsequent loans, subordinate to that of the mercantile company, he had no right, without the consent of the latter, to apply the proceeds of the mortgaged property as he did. In such a case, being sufficient for the purpose, they should have been applied to the complete discharge of the original note. The rights of the parties in the remainder of the mortgaged property now in controversy should be determined as though the application of payments had been made in the manner prescribed by law."

Thus, under the provisions of a mortgage such as the Bank held in the case at bar, after notice of a second mortgage on the same property, all advances made by the holder of the first mortgage, which he is not obligated to make in the protection of his lien, stand in the position of new loans, and are inferior to the lien of the second mortgage.

■ All advances made to Marshall by the Bank for operating expenses and to discharge liens caused by necessary expenses in operating the leases, to the extent of the interest covered by its mortgages, are protected by the mortgage lien and are superior to the liens of the second mortgage, but all other advances or loans made to Marshall after April 1, 1942, were optional and are inferior to the lien of the plaintiff's mortgage and must be accounted for to the plaintiff. From the evidence it is clear that the indebtedness of Marshall to the Bank on April 1, 1942, was $27,476.91. This amount is the basis upon which the accounts should be adjusted between the parties. There is no dispute as to the amounts advanced by the Bank to Marshall subsequent to April 1, 1942, nor for what purposes the sums were advanced.

On the sale of the first 1/32nd interest prior to April 1, 1942, the larger portion of the proceeds of the sale was applied to the payment of Marshall's indebtedness and the plaintiff benefited by that, so that it is of no concern here. While it is true that on the sale of the other 2/32nds interests the contract provided that the proceeds should be applied by Marshall to his indebtedness to the Bank, his failure so to do would be a matter between him and the plaintiff only, as the plaintiff's mortgage did not cover those interests. The Bank could not be called upon to account to the plaintiff for the proceeds of the sale.

It is, therefore, the opinion of the court that the plaintiff is entitled to judgment, for the face amount of the note it holds against Marshall, together with interest, costs and attorney's fee as provided in the note and the mortgage given to secure the same, and a foreclosure of its mortgage to satisfy the judgment; that the defendant Marshall take nothing on his cross-petition; that the plaintiff is entitled to a judgment against the defendant Bank for all sums advanced to Marshall as optional loans since April 1, 1942, and collected from the earnings from oil and gas runs from the leases covered by the plaintiff's mortgage since April 1, 1942, in compliance with the views herein expressed, said amount, when paid, to be credited to the sum due from Marshall to the plaintiff; that the defendant Bank is entitled to a judgment against the defendant Marshall for the balance due it, together with interest, costs and attorney's fees as provided in the note sued upon and a foreclosure of its mortgages to satisfy the same. To all of which the defendants are granted exceptions. A form of judgment consistent with this opinion may be submitted within ten days from this date.