**In re C & P CO.**

**No. 43258–Y.**

District Court, S. D. California, Central Division.

Nov. 14, 1945.

---

Francis B. Cobb, of Los Angeles, Cal., for the bankrupt.

Frank C. Weller and Thomas S. Tobin, both of Los Angeles, Cal., and Morley Griswold, of Reno, Nev., for petitioner.

YANKWICH, District Judge.

### I. The Issues on Review

On May 17, 1944, the C & P Company, a Nevada corporation, to which we shall refer as "the debtor-bankrupt", filed a petition for arrangement under Chapter 11 of the Bankruptcy Act of 1938.[1]

Upon the filing of the petition, the matter was referred to one of the Referees of this Court, since retired, the Honorable Ernest R. Utley. The debtor-bankrupt was allowed to remain in possession.

The chief asset of the debtor-bankrupt was a ranch of some 9,000 acres in Humboldt County, State of Nevada. On May 17, 1944, it filed a petition for an order to show cause and declaratory relief, seeking to enjoin the California-Western States Life Insurance Company,—to be referred to as "the insurance company",—from enforcing against it a deed of trust, which it held on the property and seeking to adjudicate the amounts due under it.

An order to show cause was issued, returnable on the 29th day of May, 1944. Thereafter extended hearings were held in Los Angeles and at the ranch in Nevada during the months of July, August, and September, 1944. The hearings culminated in an order, dated November 15, 1944, which determined the amounts due the insurance company under the security it held.

This is a petition by the insurance company to review this order of the Referee. The order was entered by Referee Ernest R. Utley. After his resignation, the certificate on review was prepared by Referee Hubert T. Laughran. The latter certifies the following questions to be involved:

"1. The amount of the secured obligation of the California-Western States Life Insurance Company? Found by Referee Utley to be $58,068.84 plus interest at the rate of 4% per annum from December 1, 1943, to date of payment, together with $597.33 representing the payment of taxes by the respondent upon the property covered by its trust deed with interest thereon from March 24, 1944, at the rate of 7% per annum until date of payment.

[1] 11 U.S.C.A. §§ 701-799.

"2. Should there be to and included in the said secured obligation certain advances and payments made by the respondent in payment of obligations of the debtor? * * * Referee Utley determined that the said payments (other than the advance for taxes which Referee Utley determined became a part of the secured obligation) made by the respondent without the consent, knowledge and acquiescence of the court after May 17, 1944, the date of the filing of the within proceedings, did not constitute a lien or claim in the within proceeding. Referee Utley made an order that with respect to the payments and advances prior to May 17, 1944, that the payments and advances were not authorized by the terms of the trust deed although the said respondent was given the right to file an unsecured claim herein and the debtor corporation was given the further right to then object to the said claim upon its being filed. To date this unsecured claim has not been filed in the within proceeding."

The certificate also makes the comment that "since the security has been liquidated and reduced to cash, certain of the errors complained of are now moot." On February 23, 1945, the debtor corporation was adjudged a bankrupt and a trustee appointed.

## II. The Right to Review Still Exists

Notwithstanding the circumscription of the issues by the certificate of the referee, both sides have pressed upon us certain additional questions. The first of these urged by the debtor-bankrupt is that the petition for review should be dismissed because it was filed after the order of November 15, 1944, had become final, under Rule 204(b) of this Court, which became effective October 12, 1942. The rule is brief and reads: "(b) The judge or the referee may, at any time within the ten day period provided by section 39(c) of the Bankruptcy Act, or within the limit of any extension granted under this Rule, extend the time to file a petition for review, not to exceed an additional thirty days, and will not grant any extension otherwise." [2]

The Referee made three orders extending the time to review,—order dated No-vember 22, 1944, extending the time to December 27, 1944; order dated December 26, 1944, extending time to January 27, 1945; order dated February 19, 1945, extending the time to April 27, 1945. As the filing mark in the Referee's office shows that the order was entered on November 15, 1944, at 4 p. m., that date is the date of the entry, under the provisions of subdivision (a) of Local Rule 204. The first extension of the order was, therefore, timely. The second extension order was secured within the extension period, but the third one was made after the expiration of the previous extension period. The expiration date was *January 27, 1945,* but the order of extension was not secured until *February 19, 1945.* The debtor-bankrupt complains of these orders secured ex parte. It insists that the last extension was secured after the order sought to be reviewed had become final. Local Rule 204(b) seeks to carry into effect Section 39, sub. c of the Bankruptcy Act of 1938.[3] In addition to this, it makes certain that the right to extend is not confined to the first extension. but that further extensions may be granted *"within the limit of any extension granted under this rule."*

When a court rule calls for the granting of an extension for the doing of a judicial act, within a definite period. such as, for instance, the preparation and filing of a bill of exceptions and assignment of errors,[4] courts have held that this is, in effect, a statute of limitations and that the power ceases with the expiration of the limited period.[5] But this rule has not been applied to bankruptcy. Courts have held that the court or the referee in bankruptcy has the discretion of allowing a review after the expiration of a limited period, such as is provided in Section 39. sub. c of the Bankruptcy Act of 1938, or by rules similar to our Local Rule 204(b). The reason stated is that limitations of this character are not to be considered a restriction upon the judicial discretion lodged in the Bankruptcy Court,—as a court exercising equity powers, which is open at all times,—to permit a review out of time.[6] This interpretation was given final sanction by the

[2] Rules of District Court of the United States, Southern District of California. Rule 204(b).

[3] 11 U.S.C.A. § 67, sub. c.

[4] Rules of Practice and Procedure in Criminal Cases, Rule 9, 18 U.S.C.A. following section 688.

[5] Cary v. United States, 9 Cir., 1936, 86 F.2d 461.

[6] Amick v. Hotz, 8 Cir., 1938, 101 F. 2d 311; Thummess v. Von Hoffman, 3 Cir., 1940, 109 F.2d 293; Kyser v. MacAdam, 2 Cir., 1941, 117 F.2d 232; In re Albert, 2 Cir., 1941, 122 F.2d 393.

404

Supreme Court in 1942.[7] Seeking to resolve the conflict in lower court decisions, the court ended it by holding that Section 39, sub. c of the Bankruptcy Act of 1938 is not a limitation on the jurisdiction of the court to review petitions filed out of time. There is nothing in the opinions of any of these courts which intimates *that a formal application, with notice, should be* made when the Bankruptcy Court is called upon to exercise its discretion. *The granting of the extension is an exercise of such discretion.* In the present case, the Referee states in his certificate that *"if there is discretion in the Referee to enlarge or extend the time for filing of the Petition for Review, that I would so exercise my discretion to permit the filing thereof."* This we take to mean that if, before granting the order, a petition invoking the exercise of discretion had been filed and notice had been given to the other side, the Referee would have enlarged the time to prosecute the review.

I believe this approach to the rule is correct. As stated by Mr. Justice Reed in Pfister v. Northern Illinois Finance Company[8]: "The power in the bankruptcy court to review orders of the referee is *unqualifiedly* given in section 2(10). The language quoted from section 39, sub. c is rather a limitation on the 'person aggrieved' to file such a petition as a matter of right. The review out of time of the Commissioner's orders is then a matter for the discretion of the District Court." (Emphasis added.)

A discretion is nullified if its exercise is restricted in point of time or curtailed otherwise. In interpreting the powers of the bankruptcy court, the higher courts have declined to hamstring it. Thus, although there was no provision for rehearings in Section 77b of the old Bankruptcy Act, the Supreme Court held that the right existed to reopen a petition which had *been dismissed, although the time to appeal the order had expired.*[9] A similar procedure was sanctioned, after denial of a petition for composition and extension under Section 74 of the old Bankruptcy Act.[10]

▮ The debtor-bankrupt fears that the sanctioning of extensions out of time,

without notice, might work harm in the administration of the bankruptcy law. He urges that persons interested in the estate, and title companies, would be at a loss to know when finality has attached to an order. The answer was given by the Supreme Court. The time limit *affects* the right to review. But it *does not affect* the discretion of the court. If the time limit has expired, the aggrieved litigant or the title company knows that review, as a matter of right, has been lost by the objector. He cannot complain that the Court, in its discretion, may entertain such a review. For he is dealing with a court which *has such discretion.* Of course, in exercising it, the Judge or Referee must protect any intervening rights. And a person dealing with a court which exercises the broad discretion of the bankruptcy court must be presumed to have assumed the risk of having that court exercise its sound judgment to recapture for an aggrieved party, *indirectly*, a right which he may have lost through failure to act within time.

Here there were no intervening rights. The object of the extensions was to allow the sale of the property which might have warranted the abandonment of the review entirely. The sale was actually consummated, and at least some of the questions involved in the review have become moot. No one has been hurt. So we need not speculate on any possible hardship that might arise from the application of this broad policy. We must trust the referees to exercise their discretion within the limits of equity and good sense.

The motion to dismiss the petition for review is therefore denied.

### III. There Was No Actual Default

We come now to a consideration of the two questions certified by the Referee: They may be combined into one as the petitioner has done here. So combined, the problem they involve is: Was the Referee right in limiting the secured debt to the amount due on the promissory note which the trust deed secured, together with the advances for taxes, against the contention of the secured creditor that it was entitled to a secured claim of some $1,400 in addition, on account of advances it made.

[7] Pfister v. Northern Illinois Finance Corporation, 1942, 317 U.S. 144, 63 S. Ct. 133, 87 L.Ed. 146.

[8] Pfister v. Northern Illinois Finance Corporation, 1942, 217 U.S. 144, 153, 63 S.Ct. 133, 139, 87 L.Ed. 146.

[9] Wayne Gas Co. v. Owen-Illinois Glass Co., 1937, 300 U.S. 131, 137, 57 S.Ct. 382, 81 L.Ed. 557.

[10] 11 U.S.C.A. § 202. See Bowman v. Loperena, 1941, 311 U.S. 262, 266, 61 S.Ct. 201, 85 L.Ed. 177.

The petitioner has tied this problem to the question whether there was a default by the debtor-bankrupt under the deed of trust. We cannot follow it in its assertion that the question of the default calls for determination at this time. The property has been sold. The secured creditor did not object to the sale. In fact, it delayed the review, in the hope of a sale. The money realized from the sale exceeds by many thousand dollars the secured claim. And while the petitioner might originally have been aggrieved by the order, its reversal now and a finding to the contrary would avail it naught. We certainly should not reverse an order which has become moot merely to allow counsel for the secured creditor to claim an attorney's fee for the work they might have done in filing the notice of default.

However, the question of default is tied to the other problems and must be considered with them. Their determination turns, ultimately, on the undertakings in the deed of trust.

The most essential ones are these:

"A. Trustor promises and agrees, during the continuance of these Trusts:

"1. For the purpose of protecting and preserving the security of this Deed of Trust: (a) to properly care for and keep said property in good condition and repair; (b) not to remove or demolish any building thereon; (c) to complete in a good and workmanlike manner any building which may be constructed thereon, and to pay when due all claims for labor performed and materials furnished therefor; (d) to comply with all laws, ordinances and regulations requiring any alterations or improvements to be made thereon; (e) not to commit or permit any waste or deterioration thereof; (f) not to commit, suffer or permit any act to be done in or upon said property in violation of any law or ordinance; (g) to cultivate, irrigate, fertilize, fumigate, prune and/or do any other act or acts, all in a timely and proper manner, which, from the character or use of said property, may be reasonably necessary to protect and preserve said security, the specific enumerations herein not excluding the general.

"2. To keep the buildings and improvements now or hereafter situated upon said premises insured against loss by fire to the amount of their full insurable value and against other casualties to such extent and amount as Beneficiary may from time to time designate, all of which insurance shall be written by companies satisfactory to and approved by Beneficiary under policies containing appropriate provisions for the payment of all losses under such insurance to Beneficiary. All of such policies shall be delivered to and held by Beneficiary at all times during the continuance of these trusts. The amount received by Beneficiary under any such insurance shall be applied and credited upon the obligations secured hereby in such manner as Beneficiary shall determine. At Beneficiary's option, the amount so received, or any part thereof may be released to the Trustor.

"3. To appear in and defend any action or proceeding purporting to affect the security of this Deed of Trust, the interests of Beneficiary or the rights, powers and duties of Trustee hereunder; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary and/or Trustee may appear.

"4. To pay: (a) before delinquency, all taxes and assessments affecting said property, (including assessments for appurtenant water stock), and any costs or penalty thereon; (b) when due, all encumbrances (including any debt secured by deed of trust) and/or interest thereon, which appear to be liens or charges upon said property or any part thereof prior to this Deed of Trust; (c) all costs, fees and expenses of these Trusts, including cost of evidence of title, appraisal and reappraisal fees, mortgage and tax reports, attorney's fees, Trustee's fees in connection with sale, whether completed or not.

"5. To pay, without demand, one day after date of outlay, all sums expended by Trustee or Beneficiary under the terms hereof with interest from date of expenditure at the rate of ten per cent per annum.

"B. Should Trustor fail or refuse to make any payment or do any act which he is obligated to make or do, at the time and in the manner herein provided, then Trustee and/or Beneficiary, each in his sole discretion, may, without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof;

"1. Make or do the same in such manner and to such extent as may be deemed necessary to protect the security of this Deed of Trust.

"2. Enter upon and take possession of said premises, or any part thereof, either

personally or by a Receiver appointed by a Court therefor and exclude Trustor therefrom, and use, operate, manage and control said property and conduct the business thereof and perform such acts as may be necessary or proper to conserve the value thereof, and, with or without entering into such possession, collect and receive the rents, issues and profits and the income therefrom (which rents, issues and profits and income are hereby assigned, effective upon any such failure on the part of Trustor, to Beneficiary) and apply the same in the manner hereinafter specified in respect to the proceeds of the sale of said premises; also to exercise such other powers in respect to said premises as such Court may direct. All expenses incurred in connection with the foregoing shall be deemed to be a portion of the expenses of this trust and secured hereby.

"3. Commence, appear in or defend any action or proceeding affecting or purporting to affect the security of this Deed of Trust, the interests of Beneficiary or the rights, powers and duties of Trustee hereunder, whether brought by or against Trustee or Beneficiary: or

"4. Pay, purchase, contest or compromise any prior claim, debt, lien, charge or encumbrance which in the judgment of either may affect or appear to affect the security of this Deed of Trust, the interests of Beneficiary or the rights, powers and duties of Trustee hereunder.

"Provided, that neither Trustee nor Beneficiary shall be under any obligation to make any of the payments or do any of the acts above mentioned, but, upon election of either or both so to do, employment of an attorney is authorized and payment of the fees of such attorney in a reasonable sum is hereby secured."

The notice of default was filed on February 25, 1944. It charged five alleged delinquencies:

1. Failure to pay rental on the Gentil Bernard Lease and its acquisition by a third party.

2. Sale of farm equipment attached to realty.

3. Allowing obligations to become liens against the real estate.

4. Failure to properly farm and irrigate the land.

5. Sale of live stock from the ranch.

The actual issue was reduced to two matters: The claimed loss of the Bernard lease and the failure to care properly for the land.[11]

■ I believe the Referee was right in holding that there was no default. It is to be borne in mind that this ranch contained 9,000 acres chiefly used for cattle raising with a little incidental farming, mostly dry farming carried on on a few acres. The debtor-bankrupt purchased it on June 9, 1943, paying $80,000 for the land and $65,000 for 884 head of cattle. The deed of trust was given to secure the sum of $65,000, payable in ten annual installments of $8,000 each. The installment of $8,000 which became due on December 1, 1943, was paid. The Bernard lease was dated January 1, 1942. It covered 680 acres of grazing land and called for a rental of $100 per year payable on January 1 of each year. It contained an option to renew for another year, if the lessee should not purchase the premises. The option to purchase was conditioned on an option to purchase by others. It read: "Should any other person or persons make an offer for said lands and premises and fix a price which such persons or persons are willing and agree to pay for the said premises and such price is acceptable to Lessor, then and in that case the said Lessee shall have the right and privilege to purchase the said lands and premises at the same price as is offered by any other such person or persons; provided, however, that the price so named by such person or persons shall not be a fictitious price intended to force the said Lessee to purchase the said premises at such fictitious price."

Sale to others was made subject to the lease. The insurance company succeeded

[11] The alleged removal of equipment was, at most, an attempted sale of parts of an obsolete engine used for pumping water for $750, which the debtor-bankrupt called off when notified by the insurance company that they objected to it. Incidentally, and as evidencing the feeling in this case, the insurance company caused the arrest of Clark Coe, the president, for theft through Mervyn H. Brown, District Attorney of Humboldt County, Nevada, whom they had used as their nominee to secure the Bernard lease. The cattle on the ranch not being a part of the security, the alleged ground of forfeiture on account of their sale was without foundation. And no liens were shown to have attached to the land, other than possibly the lien for taxes, if they had remained unpaid.

to the interest of the lessee. It, in turn, transferred it to the debtor-bankrupt, who made it a part of the security under the deed of trust. A hundred dollars rental became due under it on January 1, 1944. Bernard had no definite habitation. He never made a demand for the payment of the rent. More, the debtor-bankrupt did not have the lease, the only copy of it being in the possession of the insurance company. Bernard never seemed to have worried about the payment of the rent. They just sent it to him. Yet without any demand on Bernard's part upon the debtor-bankrupt or upon them, the insurance company sought him out, paid him the rent due. And without Bernard's giving notice of forfeiture of the lease by reason of nonpayment of rent, the insurance company secured a new lease in the name of its nominee, Mervyn Brown, District Attorney of Humboldt County, Nev., who, on the same day, February 10, 1945, assigned it to them.

I have read the record and I am of the view that the Referee reached a correct conclusion when he found that the Bernard lease was not in default, that it was not forfeited, and that by going out and acquiring this lease from a man with whom they had dealt for years previously, and who, so far as the record shows, may not even have known of the transfer of the lease to the bankrupt and its inclusion in the trust deed, they waived the default. Their subsequent acquisition of the lease by their nominee restored the lease and all the rights thereunder to the bankrupt.[12] The insurance company has conjured up a specter,—the possibility that some sheepmen could have acquired the Bernard few hundred acres and by putting sheep on them, might have interfered with the cattle grazing to which this ranch was devoted. Bernard was not produced as a witness by the insurance company. He was, no doubt, available and would have been as accommodating to it as he had been in the matter of the new lease. As already stated, he did not make demand for the rent or declare a forfeiture of the lease and option that went with it. There is nothing in the record to indicate that he was negotiating with anyone else for the transfer of the lease. More particularly, with sheepmen. Nor does it appear that in the dead of winter when this lease was acquired by the insurance company, any "leasehounds" were roaming the frozen fields of Humboldt

[12] See Moore Investment Company, 9 Cir., 1934, 71 F.2d 711. The insurance company seems to take the view that the failure to pay the rent on January 1 automatically terminated the lease and option. The lease says that "if the rent should not be paid on the date herein specified, this lease becomes void and of no force and effect." This does not work an automatic forfeiture. It still calls for action on the part of the lessor whether he will choose to forfeit and reenter. See: Costello v. Martin Bros., 1925, 74 Cal.App. 782, 241 P. 588; J. B. Hill Co. v. Pinque, 1919, 179 Cal. 759, 178 P. 952; McNeece v. Wood, 1928, 204 Cal. 280, 267 P. 877; Buchanan v. Banta, 1929, 204 Cal. 73, 266 P. 547; Kern Sunset Oil Co. v. Good Roads Oil Co., 1931, 214 Cal. 435, 6 P.2d 71; Johnson v. Sanches, 1942, 56 Cal.App.2d 115, 117, 132 P.2d 853. The mere fact that the lease was coupled with a rather indefinite option did not dispense with the necessity of action on the part of the lessor. The cases cited by the insurance company (Swift v. Occidental Mining Co., 1903, 141 Cal. 161, 173, 74 P. 700; Mariposa Commercial etc. Co. v. Peters, 1932, 215 Cal. 134, 141, 8 P.2d 849; Chapman v. Great Western Gypsum Co., 1932, 216 Cal. 420, 14 P.2d 758, 85 A.L.R. 917) do not contain a contrary teaching. They merely hold that where a lease is coupled with an option to buy, it is a covenant running with the land. In all *actual notice of forfeiture for breach of covenant was given*. In the case last cited, the court, speaking of the breach of a covenant against assignment, said: "The only remedy for the breach of such a covenant would be the exercise by the lessor of his option to forfeit the lease." 216 Cal. at page 427, 14 P.2d at page 761, 85 A.L.R. 917. And see: People v. Klopstock, 1944, 24 Cal.2d 897, 901, 151 P.2d 641; Taylor v. Odell, 1942, 50 Cal.App.2d 115, 121, 122 P.2d 919. This is also the rule elsewhere as applied to nonpayment of rent. 32 Am. Jur., Landlord and Tenant, §§ 852, 855. The Ninth Circuit Court of Appeals has followed it very recently. See, Western Mesa Oil Corporation v. Edlou Co., 1944, 9 Cir., 143 F.2d 843, 846.

The option to renew did not, *under Nevada law*, require notice on the part of the lessee. See, Nenzel v. Rochester Silver Corporation, 1924, 48 Nev. 41, 52, 226 P. 1102, 1105. It is significant, as appears from a later report of this case (Nenzel v. Rochester Silver Corporation, 1927, 50 Nev. 352, 259 P. 632), that the forfeiture of the lease for nonpayment of rent was sustained upon the ground that *demand for the arrears in rent was made*. 259 P. at page 634.

County, Nevada, and the neighborhood seeking to "grab" any leasehold interests in which the lessees were in arrears. It is not shown that there was any sharp trading or keen competition for the acquisition of lands of this type. Cattle buyers on the broad ranges of Nevada do not engage in the sharp competition of oil companies to acquire lands by leaseholds or otherwise. So the possibility of this lease being lost was remote. More, I believe that, as the company was in possession of the sole copy of the lease, it was its duty, under the rules of every day fair dealing, to call the attention of the debtor-bankrupt to the failure, so that he might cure it. It did not do so. And its action in this and other respects indicates that it was seeking grounds,—no matter how trivial,—to place the debtor-bankrupt in default. Here, again, I feel that the Referee sensed the situation very well when in his oral opinion he said that the insurance company "were pretty hard up for grounds for foreclosure."

█ Nor was the property neglected. The deed of trust did not obligate the debtor-bankrupt to engage in any special form of farming. The ranch had been neglected in past years before it was acquired by the debtor-bankrupt. It is undisputed that he spent some $20,000 in doing work on the place and acquiring new equipment. The insurance company's insistence that certain ditches were not properly cleaned in the fall and that other operations required to be carried on were neglected, is based chiefly upon a cursory examination by one of its officers. And the witness, Amos Garley, who was the debtor-bankrupt's foreman, was contradicted in many respects not only as to the farming operations, but as to the expenses which were incurred, by the president of the Company, Clark Coe.

The Referee had the right to decide this conflict. And his findings should not be disturbed unless clearly wrong.[13]

█ I do not blame the referee for not taking much stock in Amos Garley's testimony. He was not an unbiased witness. For, while temporarily employed by the debtor-bankrupt, he had worked for the insurance company for a period of six years and was off one year. This gave the insurance company a great advantage. For, in dealing with Garley, as with Bernard, they were dealing with persons with whom they had been dealing for many years. And Garley, as the record shows, went out of his way to complain of the hardships to which they were exposed because of lack of funds with which to buy groceries and the like. Again, the Referee viewed the premises. He stated, in his oral opinion, that on his examination of the premises, he saw no evidence of waste on the land or that the farm had not been farmed in a farmer-like manner. Counsel insist that the view of the premises by the referee is not evidence under the law of Nevada. But the rules of evidence, which govern hearings in bankruptcy court, are not those of Nevada. They are, under the Rules of Civil Procedure which apply to bankruptcy proceedings, those of the state where our court sits, the state of California.[14] And the courts of California have held that whenever a trier of facts, be he judge or jury, views premises, *such view is independent evidence upon which a finding can be based*.[15] So the conclusion of the Referee, based upon conflicting testimony and what he found when he was on the premises, are entitled to be sustained unless clearly wrong.[16]

█ There remains, therefore, to consider but one question: Did the Ref-

[13] Federal Rules of Civil Procedure, Rule 52, 28 U.S.C.A. following section 723c; Weisstein Bros & Survol v. Laugharn, 9 Cir., 1936, 84 F.2d 419; Texas National Bank v. Edson, 1939, 5 Cir., 100 F.2d 789; In re Bendix, 7 Cir., 1942, 127 F.2d 759, 760; and see my opinion in Re McNay, 1945, D.C.Cal., 58 F.Supp. 960, 962.

[14] Federal Rules of Civil Procedure, rule 43(a); General Orders 36 and 37, 11 U.S.C.A. following section 53. And see, Katcher v. Wood, 8 Cir., 1940, 109 F.2d 751; Kelso v. Maclaren, 8 Cir., 1941, 122 F.2d 867, 870.

[15] Otey v. Carmel Sanitary Dist., 1933, 219 Cal. 310, 312, 26 P.2d 308; Gibson Properties Co. v. City of Oakland, 1938, 12 Cal.2d 291, 297, 83 P.2d 942; Gates v. McKinnon, 1941, 18 Cal.2d 179, 182, 183, 114 P.2d 576; City of Oakland v. Adams, 1918, 37 Cal.App. 614, 616, 174 P. 947; Vaughan v. County of Tulare, 1922, 56 Cal.App. 261, 265, 205 P. 21; Gray v. Magee, 1933, 133 Cal.App. 653, 658, 24 P.2d 948; Wade v. Thorsen, 1935, 5 Cal.App.2d 706, 712, 43 P.2d 592; Pohl v. Anderson, 1936, 13 Cal. App.2d 241, 255, 56 P.2d 992; Brugger v. Lee Yim, 1936, 12 Cal.App.2d 38, 50, 51, 55 P.2d 564. And see for the general rule, 53 Am.Jur., Trial, § 1128.

[16] See cases cited under Notes 13, 14 and 15.

eree err in holding that the advances made prior to the institution of this proceeding (other than the taxes) were not secured by the deed of trust, but could be the subject of a claim in bankruptcy, which the insurance company has never chosen to file, and that the advances after the institution of this proceeding were not recoverable at all?

I think the Referee was right in his conclusions on both questions. As already indicated, the default was improper. The insurance company did not choose, even after the notice of default, to go into possession and operate the land. They were not asked to pay Garley's salary or advance money for the payment of other bills. The debtor-bankrupt, in fact, protested. Whether the sums are reimbursable as an unsecured debt, we need not decide now.[17] And certain it is that after the institution of these proceedings and the vesting of control of the property in the court, no right to make advances existed. The exercise of such a right would fly in the face of the Bankruptcy Act, which vests title to the bankrupt's property in the bankruptcy court, with power to determine all questions respecting title to it.[18] If, notwithstanding this, a creditor were allowed to make advances to meet certain obligations of the bankrupt, the court would lose control over the property. For, how could the bankruptcy court or the trustee or the debtor-bankrupt in possession, who are all responsible directly to the court, know what is going on if a creditor assumed to liquidate certain obligations of the bankrupt, expecting the court later to reimburse him? In an old case, Judge Learned Hand aptly stated the problem when speaking of a receiver, who, in all respects, is subject to the same rule [19]:

"In such a case, as it seems to me, the creditor so assisting establishes no claim against the estate, *unless he acts at the request, express or implied, of the receiver,* at least when there is a receiver. The court must look to the receiver as the adequate custodian, and the sole person who can establish any claims for administration, except such as are otherwise expressly authorized by statute. Any services rendered by those not authorized by the receiver must be deemed to be on the account of the creditors who undertake them. They are merely volunteered, and the estate, even though actually benefited, owes nothing for them. There is no hardship in this, but absolute justice. Any creditor may apply at any time to the court upon suggestion that the receiver should authorize him to assist, and the court can so direct. But to allow claims to be established for benefits, suppositious or actual, without some initial indication that the services upon which they are based will be the subject of a charge, is wrong in principle and mischievous in application. *An estate in the custody of a court is not in need of voluntary services; there is no room for the doctrine of salvage. It is presumably being cared for adequately, and those who seek to impose upon it the benefit of their assistance do so at their own account, unless they secure some consent at the outset."* (Emphasis added.)

My decision in Re Campbell [20] does not warrant a different conclusion. The action was a proceeding under Section 75 of the old Bankruptcy Act[21]. Unable to effect a composition or extension, the farmer filed an amended petition under Section 75, sub. s [22], and was adjudicated a bankrupt. The lending company had entered into the operation of the land under a specific agreement with the owner, which continued in effect after the adjudication. As under the then statute, the owner was entitled to possession, that was made subject to the operating rights of the lender. When he reported to the Conciliation Commissioner the expense of his operations, the propriety of certain expenditures was questioned. The Commissioner disallowed them. I held that, in view of the wording of the agreement for the operation of the property, the lender was allowed to use his own judgment and was entitled to recover the reasonable costs incurred in such

---

[17] On voluntary payments, see: McMillan v. O'Brien, 1934, 219 Cal. 775, 29 P.2d 183, 91 A.L.R. 383; Diehl v. Hanrahan, 1945, 68 Cal.App.2d 32, 35, 155 P.2d 853.

[18] Bankruptcy Act of 1938, § 70, subs. a and c, 11 U.S.C.A. § 110, subs. a and c. Sampsell v. Imperial Paper Corporation, 1941, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293; City of Long Beach v. Metcalf (In re F. P. Newport Corporation, Ltd.) 9 Cir., 1939, 103 F.2d 483; City of New York v. Johnson, 2 Cir., 1943, 137 F.2d 163, 165.

[19] In re Siegel, D.C.N.Y.1918, 252 F. 197, 198.

[20] In re Campbell, 1940, D.C.Cal., 35 F.Supp. 97.

[21] 11 U.S.C.A. § 203.

[22] 11 U.S.C.A. § 203, sub. s.

operations. Here the insurance company *did not* take possession. And the facts did not warrant interference with the operations by the debtor-bankrupt either before or after the institution of the proceedings. The insurance company took advantage of the fact that those in charge of the ranch and others were persons with whom they had had dealings for many years and made advances without *anyone's request*. The security was in no way put in danger by any of the acts of the debtor-bankrupt. So that even if we assume that advances could be made to protect the security, no protection was needed. The conditions which inspired the insurance company's fear were brought on by itself with the assistance of one of its former employees, the foreman of the ranch, and Bernard, the lessor under the lease, in order to claim a default which finds no warrant in either the facts or the law.

At the oral argument, I asked counsel to cover by special briefs the question whether the deed of trust construed, as it must be, under Nevada law, warranted advances which were given a secured position. The only Nevada case which deals with the question, Chartz v. Cardelli,[23] holds to the contrary. There the Court draws a very clear distinction between advances which an encumbrance is required to make as to which the security applies and those which are merely optional. As to the latter, it holds that the creditor cannot, by making such advances, "[*add*] *voluntarily to his own incumbrance*."[24] This is also the law in California.[25]

The position of the insurance company is not strengthened by resort to arguments based on "business compulsion". I had occasion quite recently to treat this subject in an opinion.[26] The doctrine of "business compulsion", while recognized as a form of duress, under certain circumstances, cannot be carried to the extent of allowing a secured creditor to interfere with the management of the property by the owner by advancing, over his protest, money for the payment of obligations incurred in operating the lands *when the creditor is not in possession and is not operating them.* To warrant the payment of money under business compulsion, there must be an actual threat of loss. Mere fear of a future loss is not such.[27]

Here the insurance company could only act to protect its security. Neither the failure to pay the $100 rent, under the Bernard lease, nor the failure to advance money to the ranch hands in the winter time, constituted duress which called for action. They did not threaten the security in any manner.

## IV. The Immateriality of Motive

The insurance company sought to strengthen its position before the Referee by offering to prove that they were compelled to act as they did because of a certain report they had received in conjunction with an investigation of the past of Clark Coe. It was indicated in the offer of proof that the report dealt with certain of his business failures, and that by reason of its contents,—to use the language of one of its counsel,—"the insurance company was in a state of anxiety over the loan".[28]

I believe that this anxiety is the clue to its whole course of conduct. For it is inconceivable to me, as it was to the Referee, that under ordinary circumstances, a creditor holding a security which, even at a forced sale, brought over one-third more than its loan, and which had just been made current, less than three months before, through the payment of a substantial amount, should seek to find justification for forfeiture, in failures, which, even if true, were unsubstantial and did not, *at all*, imperil their security. The truth of the matter is, as I gather from the statement of counsel, that these supposedly hard-headed business men became "panicky" because of the

[23] Chartz v. Cardelli, 1929, 52 Nev. 1, 279 P. 761.

[24] Chartz v. Cardelli, 1929, 52 Nev. 1, 279 P. 761, 763.

[25] Atkinson v. Foote, 1919, 44 Cal.App. 149, 186 P. 831; Reidy v. Collins, 1933, 134 Cal.App. 713, 723, 26 P.2d 712, And see, McMillan v. O'Brien, 1934, 219 Cal. 775, 29 P.2d 183, 91 A.L.R. 383; Diehl v. Hanrahan, 1945, 68 Cal.App.2d 32, 35, 155 P.2d 853.

The distinction is given recognition in Continental Supply Co. v. Marshall, 1943, W.D.D.C.Okl., 52 F.Supp. 717, on which the insurance company places so much reliance. There are cases which give secured status to advances (See Note 138 A.L.R.), but I prefer to follow this rule which finds sanction, not only in California, but also in Nevada.

[26] Gray v. Commodity Credit Corporation, D.C., 63 F.Supp. 386.

[27] 17 Am.Jur., Duress and Undue Influence, §§ 6, 7.

[28] Transcript, p. 451.

unfavorable report on the character of Mr. Coe. Evidently, they had made the loan without an investigation. The information they received later as to Coe's previous business experiences or failures could not be considered a ground for airing this hearsay testimony before the Referee. It is true that the petition charged conspiracy. But the referee stated at the hearing that he "was not holding that there was a conspiracy." [29] It is also true that he found that the notice of default was filed "wrongfully".[30] But he used this in the sense not of *moral wrong*, which would justify the company in defending its dealings before the court, but as *"lacking in legal justification."* The facts show such lack of legal justification. And the motives of the company, the fact that they may have been driven to anxiety, had no bearing whatsoever on the case, and the Referee was justified in not allowing the offer of proof to be made.

The order of the Referee is, therefore, affirmed.

---

[29] Transcript, p. 403. In finding IX, he found specifically that there was no conspiracy between the officers of the insurance company and others to force a sale.

[30] Conclusions of law I.